**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| v. | ) |
| | )   2:17-cr-228 |
| JOSHUA WRIGHT | ) |
| MALIK CLARK | ) |
| | ) |
| Defendants. | ) |

## OPINION

**Mark R. Hornak, Chief United States District Judge**

Pending before the Court is Defendant Joshua Wright's Motion to Suppress (ECF No. 193) and Defendant Malik Clark's Motion to Suppress (ECF No. 210). Mr. Wright moved to suppress all physical evidence stemming from the search incident to his arrest, the search of a house, and the search of two cars. Mr. Clark moved to suppress physical evidence stemming from the search incident to his arrest, statements he made to the police, and electronically stored information obtained from his cell phones. For the reasons that follow, the Court will deny both motions in their entireties.

## I.    BACKGROUND

On August 23, 2017, a federal Grand Jury returned a multi-count Indictment against Defendants Joshua Wright and Malik Clark (collectively, "the Defendants"), among other individuals. (ECF No. 38.) Mr. Wright and Mr. Clark are charged at Count 1 of the Indictment with conspiracy to possess with intent to distribute in violation of 21 U.S.C. § 846. (*Id.* at 1.) Mr. Wright is also charged at Count 3 of the Indictment with knowing possession of two firearms in violation of 18 U.S.C. § 922(g)(2), and at Count 4 of the Indictment with possession of firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i). (*Id.* at 3–4.)

In due course,[1] Mr. Wright and Mr. Clark separately moved to suppress the evidence against them. (Mr. Wright's Motion at ECF No. 193[2]; Mr. Clark's Motion at ECF No. 210.) Mr. Clark also submitted two exhibits in support of his Motion: a police report and 9-1-1 computer aided dispatch transcripts. (ECF Nos. 217-1, 217-2.)[3] The Government opposed both Motions in a single filing and included as exhibits the affidavits in support of search warrants for a house, two cars, and fifteen cell phones. (ECF Nos. 247, 247-1, 247-2.) Counsel for Mr. Clark submitted a reply to the Government's response. (ECF No. 249.)

The Court held an evidentiary hearing on the Motions to Suppress. (ECF No. 256.) Two police officers testified for the Government, and the Government also introduced multiple documents into evidence. (*Id.*) At the hearing, counsel for Mr. Clark informed the Court that the testifying officers—Mr. Matthew Poling and Mr. Harrison Maddox—were each named as defendants in pending civil lawsuits, and sought to continue the hearing to investigate the allegations in those lawsuits, representing to the Court that he (Mr. Clark's counsel) had a good faith belief that the allegations in those lawsuits could implicate the testimony of Messrs. Poling and/or Maddox. The Court denied the request without prejudice but permitted defense counsel to file a motion to seek the officers' personnel files for an *in camera* review by this Court.

---

[1] Along the way, Mr. Wright has been represented by five different lawyers, two of whom were retained by him or his family, and necessitating some start-up work by each of them. In addition, Mr. Wright's current counsel raised a question as to Mr. Wright's competence. The Court proceeded to have Mr. Wright examined by an appropriate professional, and after a hearing and supplemental briefing on the topic, found that he was competent such that this case could continue to proceed against him. (ECF Nos. 149, 152, 153, 179, 187, 188, 189, 192, 203, 246.) That process took over a year to complete.

[2] Mr. Wright initially filed a rather bare-bones Motion to Suppress at ECF No. 113 by his first counsel. The Court dismissed that motion without prejudice because it was subsumed by Mr. Wright's later-filed motion to suppress at ECF No. 193. (*See* ECF No. 253.)

[3] Mr. Clark also filed a Motion to Produce 404(b) Evidence and a Motion for Additional Discovery Materials and Early Production of Jencks Material. (ECF Nos. 211, 215.) Those motions remain pending and the Court will address them at a later date.

In Mr. Clark's subsequent motion on the matter, counsel for Mr. Clark also requested that Officer Poling be recalled for cross-examination. (ECF No. 258, at 2.) The Court granted Mr. Clark's motion in part and ordered the release of seven years of personnel files of the testifying officers for an *in camera* review. (ECF No. 272.) The Court at that time deferred ruling on the request to recall Officer Poling. (*Id.* at 6.) After completing its *in camera* review of the personnel files, the Court concluded that the materials did not appear to actually impeach Officer Poling, but the Court nonetheless ordered a small portion of the records to be produced to counsel for their review. (ECF No. 291, at 4–6.) The Court denied without prejudice the request to recall Officer Poling to the stand for further cross-examination, but subject to reassertion should counsel for Mr. Clark demonstrate why further cross-examination for purposes of impeachment should be permitted. (*Id.* at 6.)

 Soon thereafter, counsel for Mr. Clark filed a renewed motion to recall Officer Poling for cross-examination based on a dashcam video and audio recording of an incident that was the focus of a civil lawsuit against Officer Poling, but otherwise is completely unrelated to the charges pending in this case. (ECF No. 308.) The Court granted that motion and scheduled a continuation of the suppression hearing in February 2021 for the limited purpose of defense counsel's recall of Officer Poling for cross-examination. (ECF Nos. 348, 353, 355.) At the end of the February 2021 hearing, the evidentiary record for the suppression motions was deemed complete.

Following the February 2021 hearing, counsel for Mr. Clark filed a post-hearing brief in support of his motion (ECF No. 359), and counsel for the Government filed a post-hearing brief in opposition to both motions (ECF No. 375). In May 2021, counsel for Mr. Wright filed a post-hearing notice informing the Court that the defense for Mr. Wright rested on the filings and testimony already before the Court. (ECF No. 386.) The matter is now ripe for disposition.

## II.     **FACTUAL FINDINGS**

"On a motion to suppress evidence, the trial judge sits as the finder of fact." *United States v. France*, 414 F. Supp. 3d 747, 750 (W.D. Pa. 2019) (citing *United States v. Harris*, 884 F. Supp. 2d 383, 387 n.2 (W.D. Pa. 2012)). Accordingly, a district court judge assesses the credibility of witnesses, weighs the evidence, and draws any appropriate conclusions and inferences from the evidence. *Id.*

The Government called two witnesses to testify at the suppression hearing. The first witness was Officer Poling, a former City of Pittsburgh Police Officer, who at the time of the hearing was an officer with the Bethel Park Municipality Police. The second witness was Officer Maddox, a City of Pittsburgh Police Officer. Both witnesses were involved in the arrests of Mr. Wright and Mr. Clark on July 17, 2017, and they testified about those arrests and the events leading up to them. In addition, Officer Poling testified on renewed cross-examination about actions he took as a police officer in an unrelated matter.

The Government also submitted as evidence bench warrants for Mr. Wright and Mr. Clark (Exhibits 1 and 2), a police report (also submitted by counsel for Mr. Clark as an exhibit to Mr. Clark's Motion) (Exhibit 3), and the applications for search warrants (Exhibit 4). The officers' testimonies, coupled with the documentary evidence, provides the factual record that the Court considers when deciding the Defendants' Motions.

Based on the Court's estimation and experience, coupled with the Court's personal observation of their testimony and demeanor as witnesses, and in light of the Court's consideration of their testimony in the context of all of the admissible evidence before the Court, the Court finds and concludes that both officers testified credibly. Mr. Clark's efforts to impeach Officer Poling by undermining his credibility on cross-examination at the suppression hearing were in the Court's judgment unsuccessful. The continued follow-up cross-examination of Officer Poling authorized

by the Court's later Order did not reveal any inconsistencies or flaws in his testimony that would cause the Court to question the veracity of his testimony at either proceeding. And Mr. Clark's post-hearing briefing does not discuss the February 2021 follow-up cross-examination of Officer Poling.

### A.  Testimony of Officer Poling

Officer Poling testified about the events that occurred on July 17, 2017. At that time, Poling was an officer for the City of Pittsburgh Police. He testified that he had responded countless times to reports of drug sales and violent crimes on the 6200 block of Auburn Street. (ECF No. 360, at 44:2–6.) On July 17, 2017, he was working with two partners, Officers Harrison Maddox and Christopher Joliet. (ECF No. 360, at 42:10–11.) At around 6:00 p.m., they responded to a 9-1-1 call about a man sitting in front of 6214 Auburn Street who was allegedly carrying a blue drawstring bag containing heroin and/or fentanyl and a firearm. (*Id.* at 43:2–7, 44:9–12, 45:11–16.) The caller described the man as a Black male approximately 30 years old called "Menace" or "Dezmen" who was wearing a white t-shirt, a blue baseball hat, and blue shorts. (*Id.* at 44:12–45:17.) The officers, who were working in a plainclothes capacity, drove together to the specified address and observed a man sitting in front of 6214 Auburn Street matching the exact description from the 9-1-1 call. (*Id.* at 45:23–46:6.)

When Poling stepped out of the car and made eye contact with the man matching the description, the man stood up and picked up a blue drawstring bag. (*Id.* at 46:22–47:6.) Poling identified himself as being the police and had his badge visibly displayed around his neck. (*Id.* at 42:15–17.) Poling told the man to "stand right there," at which point the man shuffled and walked backwards and then "made a very quick gesture trying to escape" towards 6216 Auburn Street. (*Id.* at 47:18–20.) The man disobeyed Poling's continued commands to stop and went into 6216

Auburn Street. (*Id.* at 48:10–49:8.) Poling ran towards the man and reached the 6216 Auburn Street doorway before the door completely shut. (*Id.*) Poling followed the man into the house and observed the man run down a hallway. (*Id.*) Poling ran after the man into a kitchen area where he saw the man stuffing the blue drawstring bag into a freezer. (*Id.*) At that point, Poling ordered the man at gunpoint to show his hands. (*Id.* at 49:12–15.) Poling believed there were others in the house because he observed the man shouting towards a doorway. (*Id.*) Poling handcuffed the man and took him into custody. (*Id.* at 51:2–4.) Poling learned of the man's identity—Mr. Dezmen Hicks—after detaining him. (*Id.* at 53:10–12.) Poling later discovered that the blue drawstring bag contained approximately 25 bricks of heroin. (*Id.* at 55:1–4.) Poling authored the 6216 Auburn Street search warrant application, which listed Desiree White and her brother Derek White as the homeowners. (*Id.* at 55:24–56:2, 57:4–7.)

On cross-examination by counsel for Mr. Clark, Poling testified in more detail about these events. Poling reviewed the police report, which he assisted in compiling, and testified that nothing was found in the house related to Mr. Clark. (*Id.* at 68:4–11, 69:19–21.) Poling had not been given information about any other individuals besides Mr. Hicks (*id.* at 66:25), and the call alerting the officers to Mr. Hicks's description played out loud on the car radio (*id.* at 61:15–23).

On cross-examination by counsel for Mr. Wright, Poling testified that the doors of 6214 and 6216 Auburn Street are directly next to each other. (*Id.* at 76:2–5.) Mr. Hicks did not quicken his pace to a run until Mr. Hicks was inside 6216 Auburn. (*Id.* at 76:7–13.) Poling testified that he did not see Mr. Hicks do anything wrong or illegal before Poling entered the residence. (*Id.* at 78:5–7.) Poling reviewed the police report of the incident and testified that Mr. Hicks shouting toward a doorway was not mentioned in the report. (*Id.* at 79:16–80:18, 81:12–18.) Poling testified that his partners advised him that there were indicia of residency found in the property belonging

to Mr. Wright. (*Id.* at 83:15–19.) Poling packaged a pistol from a bedroom that officers believed belonged to Mr. Wright. (*Id.* at 81:23–82:3.)

In February 2021, counsel for Mr. Clark recalled Poling for the purpose of further cross-examination. (*See* ECF No. 358.) Counsel for Mr. Clark questioned Poling about a traffic stop and police chase that Poling initiated in a different case with different participants. (*See id.*)

### B.  Testimony of Officer Maddox

Officer Maddox also testified about the events of July 17, 2017, and the arrests of Mr. Wright and Mr. Clark. He testified that he was familiar with the 6200 block of Auburn Street because he had responded multiple times to calls about narcotics, firearms, and gang activity in that specific area. (ECF No. 360, at 90:5–12.)

Maddox testified that it was a very fast-going investigation. (*Id.* at 98:4–6.) When Poling began approaching Mr. Hicks, Officers Maddox and Joliet attempted to cut off a possible avenue of escape by running around the rear of the residence. (*Id.* at 91:10–16.) Maddox was approximately 50 feet behind Joliet, and Maddox heard Joliet yell multiple times, "Police. Stop." (*Id.* at 92:18–93:11.) Joliet later told Maddox that he saw two men run out of the back of a tent that was attached to 6216 Auburn Street. (*Id.* at 95:8–15.) Joliet also told Maddox that that he had observed both men "making some type of throwing motion" over a fence toward a hillside behind the houses. (*Id.* at 96:1–8.)

When Maddox turned the corner at the back of the residence, he observed one of these men—later identified as Mr. Wright—running and then falling to his stomach. (*Id.* at 92:20–24, 94:10.) The officers quickly went to detain Mr. Wright. (*Id.* at 94:10–14.) Maddox testified that "immediately upon approaching" Mr. Wright, Maddox was "met with the overwhelming smell" of fresh marijuana coming from Mr. Wright. (*Id.* at 94:10–25.) Officers Maddox and Joliet applied

handcuffs to Mr. Wright and put him under arrest for fleeing a lawful order to stop. (*Id.* at 95:2–15.) Maddox testified that Mr. Wright was also detained for other reasons, including because the police had arrived at the location based on a call describing a male in possession of heroin and a firearm, and Mr. Wright was seen in the "likely avenue of escape" if someone were to run out of the rear of the residence. (*Id.* at 96:1–8.) Maddox testified that, based on his experience as a police officer, he also had suspicion that the men may have been trying to discard evidence when they were observed making a "throwing motion" over a fence. (*Id.* at 98:12–18.) A K-9 officer later recovered a firearm from the hillside where Joliet observed the Defendants making the throwing motion. (*Id.* at 97:14–19.) Upon detaining Mr. Wright, Maddox did a pat down of him for officer safety. (*Id.* at 98:19–99:7.) Due to the smell of fresh marijuana emanating from Mr. Wright, Maddox "did a search and recovered some marijuana" and "did a search incident to arrest for that possession of marijuana" and recovered heroin, more marijuana, a cell phone, and car keys to a Lexus and a BMW. (*Id.*)

At this point, Mr. Clark had not yet been detained, and Joliet put out a description of him to responding officers. (*Id.* at 99:10–14.) Maddox testified that Mr. Clark was soon detained and handcuffed by two other officers approximately one block away from 6216 Auburn Street. (*Id.* at 100:2–4, 110:2–7.) Maddox later went to where Mr. Clark was detained and handcuffed. (*Id.* at 99: 22–100:4.) He noticed that Mr. Clark smelled of marijuana. (*Id.* at 100:7–9.)

The officers ran Mr. Wright and Mr. Clark's identifying information through the police records database and confirmed that both men had multiple outstanding warrants for their arrests. (*Id.* at 100:16–19.) Both men were eventually transported to the Allegheny County Jail based on the outstanding warrants. (*Id.* at 104:19–22.)

Maddox testified that the officers did a protective sweep of 6216 Auburn for additional

occupants. (*Id.* at 105:8–13.) While performing that sweep, they saw marijuana roaches and a scale. (107:12–108:8.) The officers then obtained a search warrant to search 6216 Auburn. In one bedroom, Maddox testified that he found a pill bottle and a bible, each with Mr. Wright's name on it. (*Id.* at 108:15–20.) He testified that the officers also found in the bedroom piles of clothes, heroin, and a gun.[4] (*Id.* at 109:1–8.) In the basement, Maddox found a vial of blood with Mr. Wright's name on it. (*Id.*)

On cross-examination by counsel for Mr. Clark, Maddox testified that Joliet reported seeing a shirtless man wearing blue jeans run out of the tent attached to the back of 6216 Auburn, make a throwing motion over a fence, and then flee. (*Id.* at 119:18–121:1.) Joliet later identified Mr. Clark as the same shirtless man that he saw running from 6216 Auburn. (*Id.* at 119:21–120:19.) Maddox testified that the shirtless man was disobeying police orders to stop when the man fled. (*Id.* at 130:5–11.) Maddox, however, did not personally see Mr. Clark until after he was detained and did not personally observe Mr. Clark commit any crimes. (*Id.* at 113:14–114:14, 114:23–115:3.) Maddox testified that Mr. Clark was arrested at gunpoint, checked for warrants, and searched incident to arrest. (*Id.* at 118:1–18.) Maddox referred to the police report that he authored and testified that he did not include in the report that Mr. Clark smelled of marijuana. (*Id.* at 116:8–19.)

On cross-examination by counsel for Mr. Wright, Maddox confirmed that he saw both Defendants make throwing motions over the fence. (*Id.* at 133:12–22.) Maddox testified that he believed one of the 6216 Auburn bedrooms belonged to Mr. Wright, a belief Maddox included in an application for a search warrant for the Lexus and BMW, the two cars matching the car keys that were seized pursuant to a search incident to Mr. Wright's arrest. (*Id.* at 134:8–135:6.) Maddox

---

[4] The Court notes that the police report shows that two bottles of prescription medication labeled with Joshua Wright's name and two guns were found in the bedroom. (ECF No. 217-1, at 5.)

did not know about the outstanding bench warrants for Mr. Wright's arrest prior to his encounter with Mr. Wright. (*Id.* at 135:7–13.)

### III.   <u>LEGAL STANDARD</u>

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. Subject to certain exceptions, evidence obtained through unreasonable searches and seizures must be suppressed as "fruit of the poisonous tree." *United States v. Bey*, 911 F.3d 139, 144 (3d Cir. 2018); *see also Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963).

"Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002). Probable cause "requires more than mere suspicion; however, it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt." *United States v. Burton*, 288 F.3d 91, 98 (3d Cir. 2002). However, "[t]he probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).

In addition, officers are permitted to conduct brief investigatory stops, *Terry v. Ohio*, 392 U.S. 1, 88 (1968), so long as they have "reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Put another way, the officer must have "a particularized and objective basis for suspecting the particular person stopped" of breaking the law. *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (quoting *Navarette v. California*, 572 U.S. 393, 396 (2014)). Reasonable suspicion requires "considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette*, 572 U.S. at 397 (cleaned up). Reasonable suspicion depends on both the "information possessed by police and its degree of reliability." *Alabama v. White*, 496 U.S. 325, 330 (1990).

10

## IV.    DISCUSSION

Mr. Wright moved to suppress any items seized from Mr. Wright during a search incident to his arrest, including various controlled substances, a cell phone, and keys to two cars (the Lexus and BMW); all contents seized pursuant to the subsequent search of those two cars; and all contents obtained from the search of 6216 Auburn Street. (ECF No. 193, at 1, 12; ECF No. 360, at 30:2–19.) The searches of the two cars were done pursuant to a search warrant. The officers initially entered and conducted a protective sweep of 6216 Auburn Street without a warrant, but they later obtained a warrant to search the residence.

Mr. Clark moved to suppress any statements made by Mr. Clark post-arrest or during his detention by the police; all physical objects seized during a search incident to his arrest, including two cell phones, cash, and a bag of suspected marijuana; and any electronically stored information obtained from the two cell phones. (ECF No. 210, at 4, 5, 13; ECF No. 360, at 29:17–24, 30:24–31:3.) The electronic cell phone information was obtained pursuant to a search warrant.

The Court will deny both motions.

### A.  Mr. Wright's Motion to Suppress

Mr. Wright presents two arguments in support of his motion. First, he contends that the officers' initial pursuit of Mr. Hicks and their entry into 6216 Auburn were unlawful, and therefore all evidence obtained from the search of 6216 Auburn, as well as all evidence obtained as a result of the pursuit, arrest, and search of Mr. Wright should be excluded as fruit of the poisonous tree. (ECF No. 193, at 3–4.) Second, in the alternative, Mr. Wright argues that his detention was unlawful, and so the evidence obtained as a result of the search incident to his arrest and from the searches of the two cars should be excluded as fruit of the poisonous tree. (*Id.* at 4.)

The Government argues that Mr. Wright has not established standing to challenge Mr. Hicks's

detention or the search of 6216 Auburn. (ECF No. 247, at 8.) And even if Mr. Wright did establish standing, the Government argues that Mr. Wright's suppression argument still fails because the officers were legally justified in pursuing Mr. Hicks, entering 6216 Auburn without a warrant, and detaining and arresting Mr. Wright.

### 1. Standing

"Fourth Amendment rights are personal rights, which . . . may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978) (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969)). "The 'standing' inquiry, in the Fourth Amendment context, is shorthand for the determination of whether a litigant's Fourth Amendment rights have been implicated." *See United States v. Mosley*, 454 F.3d 249, 253 n.5 (3d Cir. 2006) (citing *United States v. Kimball,* 25 F.3d 1, 5 (1st Cir. 1994)). To have standing to challenge a search, an individual must be able to demonstrate that he had a reasonable expectation of privacy in the place or property searched. *Minnesota v. Olson*, 495 U.S. 91, 95–97 (1990). "A defendant must have standing to invoke the Fourth Amendment's exclusionary rule." *United States v. Correa*, 653 F.3d 187, 190 (3d Cir. 2011). Because Fourth Amendment rights are "personal," the proponent of a motion to suppress bears the burden of proving that a search or seizure was illegal, as well as showing a "legitimate expectation of privacy in [the place searched]." *United States v. Stearn*, 597 F.3d 540, 551 (3d Cir. 2010) (quoting *Rawlings v. Kentucky,* 448 U.S. 98, 104 (1980)).[5]

The Court concludes that Mr. Wright lacks standing to challenge the pursuit of Mr. Hicks because that did not implicate Mr. Wright's own Fourth Amendment rights. However, the Court also

---

[5] This Court recently reviewed and considered in some detail the concept of Fourth Amendment "standing," and explained that unlike an issue that goes to the Court's jurisdiction, in the Fourth Amendment context the term "standing" is part and parcel of the overall Fourth Amendment analysis in a given case, and is a shorthand way of focusing on whether the person raising a Fourth Amendment challenge has the substantive right to do so. *United States v. Wilburn*, No. 18-115, 2021 WL 1310423, at *15 (W.D. Pa. Apr. 8, 2021).

concludes that Mr. Wright has standing to challenge the entry into 6216 Auburn because there is sufficient evidence before the Court that Mr. Wright was an overnight guest with a reasonable expectation of privacy in that location.

### a.   Pursuit of Mr. Hicks

Mr. Wright argues that the officers lacked reasonable suspicion or probable cause to detain Mr. Hicks outside the Auburn Street residences. But he overlooks the question of standing, neglecting to offer evidence or argument as to why he has standing to challenge the pursuit and detainment of a third party. (*See* ECF No. 193, at 4–8.)

As explained, Fourth Amendment rights are personal rights. *Rakas*, 439 U.S. at 133–34. "It has long been the rule that a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that *his* Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Padilla*, 508 U.S. 77, 81 (1993) (emphasis in original). It follows that a defendant (here, Mr. Wright) lacks standing to challenge the search or seizure of a third party (here, Mr. Hicks) if the defendant's Fourth Amendment rights were not implicated by that search or seizure. *See Mosley*, 454 F.3d at 253 n.5. This is so because "a defendant's Fourth Amendment rights are not violated by the introduction of evidence obtained in violation of a third party's rights." *Stearn*, 597 F.3d at 551. Mr. Wright does not show how the initial pursuit of Mr. Hicks implicated his own Fourth Amendment rights when considered in that context. Mr. Wright thus lacks standing to challenge any alleged Fourth Amendment violation as to that initial pursuit of Mr. Hicks.[6]

---

[6] Though the Court concludes that Mr. Wright lacks standing to challenge Mr. Hicks's pursuit and detention, the Court recognizes that some of Mr. Wright's arguments concerning the officer's purported lack of legal justification to detain Mr. Hicks bleeds into the subsequent discussion of whether the officer had legal justification to enter 6216 Auburn, which, as discussed below, the Court concludes that Mr. Wright has standing to challenge. The Court thus addresses those arguments when considering the legal justification for the officer's warrantless entry into 6216 Auburn.

### b. Entry into 6216 Auburn Street

Mr. Wright asserts that he has a sufficient privacy interest in 6216 Auburn so as to establish standing to challenge the entry into the residence and the subsequent search. (*See* ECF No. 360, at 34:4–7.) The Government responds that Mr. Wright lacks a reasonable expectation of privacy in 6216 Auburn and therefore lacks standing to challenge the search. (ECF No. 375, at 7–8.)

To have standing to challenge the search of 6216 Auburn, Mr. Wright must establish that he had a reasonable expectation of privacy in the residence. *See Olson*, 495 U.S. at 95–97. To do so, he must show both that he had a subjective expectation of privacy and that his expectation was objectively reasonable. *Rakas*, 49 U.S. at 143 n.12. "A person who lacks the requisite expectation of privacy and is 'aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed.'" *United States v. Rose*, 613 F. App'x 125 (3d Cir. 2015) (quoting *Rakas*, 439 U.S. at 134).

Whether a defendant holds a reasonable expectation of privacy in a home depends on the facts and circumstances of the case. "Generally, a person's 'status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable.'" *United States v. Cortez-Dutrieville*, 743 F.3d 881 (3d Cir. 2014) (quoting *Olson*, 495 U.S. at 96–97). While "an overnight guest in a home may claim the protection of the Fourth Amendment, . . . one who is merely present with the consent of the householder may not." *Minnesota v. Carter*, 525 U.S. 83, 90 (1998). It remains unclear precisely where Fourth Amendment rights attach on the spectrum between an overnight guest and those simply present with the consent of the homeowner. *Rose*, 613 F. App'x at 129.

The evidence before the Court supports a finding that Mr. Wright was an overnight guest at

6216 Auburn and thus held a reasonable expectation of privacy in the home. Though the record shows

that the home was owned by individuals other than Mr. Wright, (*see* ECF No. 360, at 57:4–7

(describing Desiree and Derek White as the homeowners)), there is sufficient evidence before the Court

indicating that Mr. Wright stayed in one of the bedrooms. The officers found these items in one of the

bedrooms: two bottles of prescription medicine labeled with Joshua Wright's name, a pocket bible

labeled with Joshua Wright's name, and a pile of clothes that the officers attributed to Mr. Wright and

Officer Maddox testified would fit a man of Mr. Wright's stature. (*See, e.g.*, ECF No. 360, at 142:1–

9; ECF No. 217-1.) The police did not identify any items in that bedroom that they attributed to anyone

besides Mr. Wright. The police also found in the basement a vial of blood labeled with Joshua Wright's

name. (*Id.* at 108:14–20.) In addition, Mr. Wright had on his person a keychain with car keys to two

cars that were both parked directly outside 6216 Auburn. (ECF No. 247-1, at 4.)

Put together, the evidence shows that Mr. Wright kept his clothes, medicine, and bible in a

bedroom at 6216 Auburn, and also parked two cars outside the house. And no evidence suggests that

anyone other than Mr. Wright stayed in that bedroom. Though the Court does not necessarily know

what to make of the vial of blood found in the basement, given its very personal nature and labelled

connection to Mr. Wright, it nonetheless is further indicia of Mr. Wright's non-transient presence in

the house.

Significantly, the officers believed, based on this evidence, that one of the bedrooms "belonged

to" Mr. Wright. (*See, e.g.*, ECF No. 360, at 134:9–18.) Not only did Officer Maddox testify to this

belief at the evidentiary hearing and include it in his police report, but he also represented as much

when he authored the applications for search warrants for the two cars. In the affidavit of probable

cause, Officer Maddox stated that it was "apparent that Joshua Wright live[d] at [6216 Auburn]." (ECF

No. 247-1, at 5.) Given this understanding, Officer Maddox stated that it was "reasonable to believe

that [Mr. Wright] would have vehicles parked at the address." (*Id.*) And Officer Maddox is not the only person to represent to a court that Mr. Wright resided at 6216 Auburn. A federal officer from the Drug Enforcement Administration stated in an affidavit in support of an application for search warrants for cell phones that a bedroom in 6216 Auburn belonged to Mr. Wright. (ECF No. 247-2, at 13.) That application was submitted to Magistrate Judge Lisa Pupo Lenihan of this Court. (*Id.* at 16.)[7]

The Government argues that Mr. Wright has not met his burden to establish a reasonable privacy interest in 6216 Auburn because Mr. Wright "must do more" than simply point to "personal effects and other items in the home." (ECF No. 375, at 8.) The Government attempts to downplay the indicia of residency found in the bedroom by emphasizing that "all of it was found near drugs, firearms, and drug packaging materials," suggesting that Mr. Wright's presence in the home was for drug activity only. (*Id.* at 8–9.)

But the Government misses the point that a person could be an overnight guest in a house *and* use that same house for an alleged illicit purpose such as drug activity. Moreover, a defendant can meet his burden to establish standing "by relying on evidence in the hands of the Government, specifically including 'statements on the face of the warrant application and the [supporting] affidavit." *See United States v. Wilburn*, No. 18-115, 2021 WL 1310423, at *16 (W.D. Pa. Apr. 8, 2021) (citing *United States v. Penney*, No. 19-00008, 2020 WL 6048810, at *9 (W.D. Pa. Oct. 13, 2020)). The supporting affidavit of probable cause for the searches of the two cars stated that it was "apparent" that Mr. Wright lived at 6216 Auburn (ECF No. 247-1, at 5), and the affidavit for a search of various cell phones asserted that

---

[7] In its decision in *Wilburn*, the Court treated as compelling the statements of the law enforcement officer authoring a search warrant application that the location to be searched was where the defendant lived, and that such an affirmation to the federal judge issuing the search warrant would in and of itself demonstrate the requisite level of Fourth Amendment standing. After all, it would be strange indeed to treat the question of whether a defendant lived in a given residence as some sort of mystery when the involved police officers had told the federal judge that the place to be searched was where that same defendant resided. *See United States v. Wilburn*, No. 18-115, 2021 WL 1310423, at *16–17 (W.D. Pa. Apr. 8, 2021).

a bedroom "belong[ed] to" Mr. Wright (ECF No. 247-2, at 13).[8]

Considering this evidence, the Court concludes that Mr. Wright has met his burden to establish that he had a reasonable expectation of privacy in 6216 Auburn. He therefore has standing to challenge the entry into and search of that location.

### 2.   Reasonable Suspicion or Probable Cause

Mr. Wright argues that there was no legal justification for a police officer to follow Mr. Hicks into 6216 Auburn without a warrant, and thus all evidence against Mr. Wright should be suppressed as fruit of the poisonous tree. But for the unlawful entry into the house, he says, the officers would not have had sufficient information to secure a search warrant for that address and Mr. Wright would not have been detained and searched. (ECF No. 193, at 11.) Mr. Wright alternatively argues that even if the officer were legally justified in following Mr. Hicks into 6216 Auburn without a warrant, there was still no legal justification to detain Mr. Wright. The Government argues that exigent circumstances allowed the warrantless entry into 6216 Auburn, and that the officers were justified in detaining Mr. Wright. The Court agrees with the Government.

### a.   Legal Justification for Warrantless Entry into 6216 Auburn

The "'very core'" of the Fourth Amendment's guarantee is "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Florida v. Jardines*, 569 U.S. 1, 6 (2013). It is settled law that the Fourth Amendment generally requires police to secure a warrant before searching a home, subject to certain well-established exceptions. *See United States v.*

---

[8] At the evidentiary hearing, counsel for the United States emphasized that the application for a search warrant for 6216 Auburn stated that one of the items to be searched for and seized was "[a]ny indicia establishing residency or control over 6216 Auburn Street," thus signifying that the officers did not know who resided in the house. (*See* ECF No. 360, at 38:1–16; ECF No. 247-1, at 8.) But what matters here is that after the officers searched the house pursuant to the issued warrant, they concluded that Mr. Wright lived in one of the bedrooms. They then relied on this conclusion in subsequent warrant applications. This evidence supports a finding that Mr. Wright was an overnight guest at 6216 Auburn.

*Johnson*, 592 F.3d 442, 447 (3d Cir. 2010). One such exception is for exigent circumstances. *Kentucky v. King*, 563 U.S. 452, 455 (2011). The exigent circumstances exception "applies when 'the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *Id.* at 460 (citing *Mincey v. Arizona,* 437 U.S. 385, 394 (1978)).

There are various types of exigencies that may justify a warrantless search of a home. "Examples of exigent circumstances include, but are not limited to, hot pursuit of a suspected felon, the possibility that evidence may be removed or destroyed, and danger to the lives of officers or others." *United States v. Anderson*, 644 F. App'x 192, 194 (3d Cir. 2016) (citing *United States v. Coles*, 437 F.3d 361, 366 (3d Cir. 2006); *see also Caniglia v. Strom*, 141 S. Ct. 1596, 1603 (2021) (Kavanaugh, J., concurring) (listing examples of recognized exigent circumstances). "Exigent circumstances are determined by reviewing the objective facts reasonably known to the officers at the time of the search using the totality of the circumstances facing the officers when the search was performed." *United States v. Morgan*, 33 F. App'x 603, 605 (3d Cir. 2002). Factors that support a finding of exigent circumstances include: (1) the gravity of the crime that has been committed; (2) a reasonable belief that the suspect is armed; (3) a clear showing of probable cause based upon reasonably trustworthy information; (4) a strong belief that the suspect is in the premises; (5) "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) peaceable entry, affording the suspect "an opportunity to surrender . . . without a struggle and thus to avoid the invasion of privacy involved in entry into the home." *United States v. Anderson*, 644 F. App'x 192, 195 (3d Cir. 2016) (quoting *Dorman v. United States*, 435 F.2d 385, 392–93 (D.C. Cir. 1970)).

The Government argues that the exigent circumstances exception applies here for multiple reasons: "to protect the public from a firearm and narcotics, to prevent any destruction or concealing

of evidence, and to protect the occupants of the house while in hot pursuit of a fleeing and potentially armed felon." (ECF No. 375, at 14.)

The Court first concludes that there is no record evidence to support a finding of the "emergency aid" exigent circumstance. Even though the anonymous caller reported that the man had a gun in his bag, the caller did not say that the man had brandished, pointed, or threatened anyone with the gun. (ECF No. 360, at 74:1–3.) The cases cited by the Government to support this theory of exigency are distinguishable because they involve more "imminent" threats, such as reports of a shooting, *see Arizona v. Hicks*, 480 U.S. 321,  324 (1989); reports of shots fired, *see United States v. Parris*, 229 F. App'x 130, 134 (3d Cir. 2007); or reports of an armed burglary, *see United States v. France*, 414 F. Supp. 3d 747, 750 (W.D. Pa. 2019). This case involves significantly different facts, which do not present an "imminent" threat of injury to others that would justify a warrantless entry into a home. *See Caniglia*, 141 S. Ct. at 1599 (rejecting community caretaking exception but recognizing that exigent circumstances may exist when there is a need to protect an occupant from imminent injury).

But the record supports a finding of exigent circumstances based on a "hot pursuit" of a suspected fleeing felon or a destruction of the evidence exigency. In reaching this conclusion, the Court circles back to what brought the officers to this block of Auburn Street in the first place. The officer's entry into 6216 Auburn began with a tip that a man in front of 6214 Auburn was carrying a gun and heroin in a blue drawstring bag. The 9-1-1 caller said that they personally observed the gun and drugs in the bag and provided specific details about the man's name and nickname, age, and clothing. The responding officers were familiar with this specific block, having previously responded there multiple times to reports of open-air drug sales, firearms violations, and shots fired.

Most of the tip's substance was immediately corroborated by the officers' own observations

upon their arrival to the address. The officers saw a man—later identified as Mr. Hicks—in the exact outfit and in the exact location described by the caller. And the officers observed that the man possessed a blue drawstring bag, which was alleged by the caller to contain heroin and a gun. When the officers arrived at the address, Officer Poling exited the vehicle, and as soon as he made eye contact with the man, the man stood up and grabbed the drawstring bag. (ECF No. 360, at 47:1–11.) Officer Poling verbally identified himself as police and told the man to stop, at which point the man began shuffling and walking backwards, and then turned quickly toward 6216 Auburn and fled into that address. (*Id.* at 47:12–48:18.) Officer Poling pursued the man into 6216 Auburn, all the while continuing to identify himself as police and telling the man to stop.

Mr. Wright compares these circumstances to those in *Florida v. J.L.*, 529 U.S. 266 (2000). (*See* ECF No. 193, at 6.) In that case, the police received an anonymous call "that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." *J.L.*, 529 U.S. at 268. The United States Supreme Court held that such a tip alone was insufficient to establish reasonable suspicion for police to stop a man meeting that description. *Id.* at 271. But the circumstances here are different than *J.L.* First, though the tip was anonymous to the officers at the time, the 9-1-1 call had elements that bolstered the tip's reliability. *See United States v. Torres*, 534 F.3d 207, 211 (3d Cir. 2008) (describing specific aspects of tips that indicate their reliability). For one, the caller used the 9-1-1 emergency system to call in the tip. *See Navarette v. California*, 572 U.S. 393, 400 (2014) (describing caller's use of the 9-1-1 emergency system as an indicator of veracity); *United States v. McCants*, 920 F.3d 169, 176 (3d Cir. 2019) (same), *vacated on other grounds*, *McCants v. United States*, 140 S. Ct. 375 (2019). For another, the caller stated that they were next door to 6214 Auburn and had personally observed the firearm and heroin in the man's bag. *See Torres*, 534 F.3d at 211 (explaining that information provided by a person who recently witnessed alleged criminal activity

bolsters the tip's reliability). On this point, the Court notes that the officers arrived at the location no more than five minutes after the call was dispatched, and the subsequent events occurred just after the officers' arrival. (ECF No. 360, at 91:7–9.)

Second, the tip does not stand alone. Officer Poling's belief that Mr. Hicks was engaged in criminal activity was premised on the totality of circumstances, which included the detailed tip of the caller's personal observations, such as the man's outfit, name, age, and specific location; the officer's observations corroborating the tip; the officer's observations of Mr. Hicks once they made eye contact; Mr. Hicks's refusal to obey police orders; and the officers' knowledge of criminal activity on the 6200 block of Auburn Street. *Cf. United States v. Brown*, 448 F.3d 239, 252 (3d Cir. 2006) (concluding that no reasonable suspicion existed where the police received an "excessively general description" of the suspect and in the absence of corroborating observations by the police). When Officer Poling tried to conduct an investigatory stop based on this particularized and objective basis for suspecting criminal activity, Mr. Hicks fled. And he did so while holding a bag containing what Officer Poling suspected was narcotics and a firearm.

The Third Circuit has explained that "[n]either an anonymous tip nor a suspect's flight from police creates probable cause on its own." *United States v. Acosta*, 751 F. App'x 201, 201–02 (3d Cir. 2018). But the Third Circuit also recognized that "those facts, combined with others, can add up to probable cause." *Id.* And "[i]t is well established that where police officers reasonably suspect that an individual may be engaged in criminal activity, and the individual deliberately takes flight when the officers attempt to stop and question him, the officers generally no longer have mere reasonable suspicion, but probable cause to arrest." *United States v. Navedo*, 694 F.3d 463, 472 (3d Cir. 2012) (citing *United States v. Laville*, 480 F.3d 187 (3d Cir. 2007)). That is what happened here. Viewed collectively, the circumstances created probable cause to arrest Mr. Hicks.

And when Mr. Hicks fled from police, it was reasonable for Officer Poling to suspect that Mr. Hicks was attempting to evade arrest and/or to destroy evidence. The "hot pursuit" exigency usually requires "some element of a chase," even if it ends "almost as soon as it began." *United States v. Santana*, 427 U.S. 38, 43 n.3 (1976). "The fact that the pursuit here ended almost as soon as it began did not render it any the less a 'hot pursuit' sufficient to justify the warrantless entry into [the] house. Once [Mr. Hicks] saw the police, there was likewise a realistic expectation that any delay would result in destruction of evidence." *See id.* When officers have "probable cause to believe contraband is present and, in addition, based on the surrounding circumstances or the information at hand, they reasonably conclude that the evidence will be destroyed or removed before they can secure a search warrant, a warrantless search is justified." *United States v. Rubin*, 474 F.2d 262, 268 (3d Cir. 1973). Based on the totality of circumstances, Officer Poling had probable cause to believe Mr. Hicks not only possessed evidence but was at risk of destroying it.

As a result, exigent circumstances existed that justified the warrantless entry into 6216 Auburn. Mr. Wright's argument that evidence should be suppressed as fruit of the poisonous tree of the unlawful entry in 6216 Auburn thus fails.[9] The Court will not suppress any evidence seized from 6216 Auburn.

### b. Legal Justification for Mr. Wright's Stop and Arrest

Mr. Wright's alternative argument is that the officers lacked reasonable suspicion or probable cause to detain him. He contends that there was no legal justification to pursue Mr. Wright or suspect him of criminal activity because the tip did not concern him. The Court finds Mr. Wright's arguments

---

[9] In his Motion to Suppress, Mr. Wright did not challenge the sufficiency of the probable cause for the warrant to search 6216 Auburn. But at the evidentiary hearing, counsel for Mr. Wright stated that he was challenging the probable cause to get the warrant to search the house. (ECF No. 360, at 33:13–17.) To the extent that Mr. Wright's Motion is based on that argument, it too fails. Counsel for Mr. Wright provided no reason at all to support a challenge to the issuing judge's probable-cause determination to issue a search warrant for 6216 Auburn. Nor does he argue why the good-faith exception would not apply to avoid suppression in any event. *See United States v. Leon*, 468 U.S. 897 (1984).

unpersuasive.

The officers first had reasonable suspicion of criminal activity as needed to detain Mr. Wright for an investigatory stop. The factors previously recognized by our Court of Appeals as supporting such a detention and stop are present on the record here: Mr. Wright's exit from 6216 Auburn and his subsequent flight from police, particularly in the context of the tip that brought the officers to Auburn Street in the first place; Mr. Wright's presence in a "high-crime" area; and the officer's observations of Mr. Wright making a throwing motion over a fence. Together, these factors aroused reasonable suspicion. *See United States v. Figueroa*, 687 F. App'x 187, 189 (3d Cir. 2017) (finding stop valid where defendant was present in a high-crime area, pocketed an item that officers believed to be a gun, and fled from police). More specifically, Mr. Wright fled from police after an officer observed him run from a tent attached to the back of 6216 Auburn and then make a throwing motion over a fence consistent with an attempt to discard evidence.[10] (ECF No. 360, at 95:8–96:8, 132:10–133:22.) Mr. Wright ignored the officer's orders to stop and was detained when he fell as he tried to flee. (*Id.*) Even though the initial tip only referred to Mr. Hicks, it is nonetheless relevant to the totality of circumstances that the officers were on the scene because of information about a potentially armed person, who the police had seen run into the very house from which Mr. Wright promptly exited out of the back door.

Officer Maddox testified that Mr. Wright was initially arrested for fleeing a lawful order to stop. (ECF No. 360, at 95:6–15.) He later explained that an officer gives a "lawful order to stop" when the officer can articulate a reasonable belief that the person is likely armed or involved in criminal activity. (*Id.* at 137:21–138:7.) Because the Court finds that the officers had reasonable suspicion to

---

[10] The police later discovered a firearm in the area beyond the fence. That gun is not charged in the Indictment. To the extent Mr. Wright moves to suppress that firearm, the Government is correct that Mr. Wright's argument must fail. If anything, Mr. Wright abandoned that firearm while fleeing and before being seized. So it was not the fruit of any seizure. *See California v. Hodari D.*, 499 U.S. 621, 629 (1991).

detain Mr. Wright, it appears to the Court that it may have been valid for the officers to arrest Mr. Wright for fleeing a lawful order to stop. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) (holding that a police officer does not violate the Fourth Amendment by arresting an individual who the officer has probable cause to believe committed "even a very minor criminal offence in his presence").

But the Court uses the phrase "may have been" because the evidentiary record and the Government's legal arguments are not fully developed on this point. Given that the police developed probable cause immediately upon stopping Mr. Wright for the alternative or additional reason that Maddox smelled fresh marijuana emanating from Mr. Wright's person, the Court need not wade into a discussion about the effect of disobeying "lawful orders" on the probable cause calculus, and will not do so here. *See generally* James Mooney, *The Power of Police Officers to Give "Lawful Orders,"* 129 YALE L.J. 1568 (2020) (discussing the "significant uncertainty about what makes an order lawful"); Orin Kerr, *Sandra Bland and the 'lawful order problem*, THE WASH. POST (July 15, 2015), https://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/07/23/sandra-bland-and-the-lawful-order-problem/ ("Even if the police pulled over the world's greatest legal expert, the citizen *still* couldn't know what orders are lawful because the laws often hinge on facts the citizen can't know.").

Regardless of any violation of a "lawful order," the record shows that once Mr. Wright was stopped, the officer smelled an "overwhelming" smell of fresh marijuana emanating from Mr. Wright. (ECF No. 360, at 94:10–25; ECF No. 217-1, at 4 ("When I approached Joshua Wright I was met with the overwhelming smell of un-burnt marijuana coming from his person. My previous experience and training indicated that it was evident that Joshua Wright possessed unburnt marijuana on or about his person.").) "It is well settled that the smell of marijuana alone, if articulable and particularized, may

establish not merely reasonable suspicion, but probable cause." *United States v. Registe*, 830 F. App'x

708, 710 (3d Cir. 2020) (explaining that Third Circuit case law recognizes that the smell of marijuana

can provide probable cause (citing *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006))); *see*

*also United States v. Jackson*, 682 F. App'x 86, 87–88 & n.1 (3d Cir. 2017) (recognizing that an officer

has probable cause to arrest "[s]o long as an officer smells the odor of marijuana and can localize its

source with sufficient particularity"). The officer therefore had probable cause to arrest Mr. Wright at

that point. The officer was lawfully permitted to conduct a search incident to arrest, during which the

officer located narcotics, two car keys, and a cell phone. *See Arizona v. Gant*, 556 U.S. 332, 338 (2009).

The officers then applied for a search warrant to search the cars that matched up with those keys.

        In sum, the Court concludes that the officers had reasonable suspicion to detain Mr. Wright in

order to conduct a brief investigatory stop. That reasonable suspicion turned into probable cause at

least once the officer smelled fresh marijuana on Mr. Wright's person.[11] Upon Mr. Wright's arrest, the

officers were lawfully permitted to conduct a search incident to arrest. The search incident to arrest

yielded in part two car keys. The officers later searched those vehicles pursuant to a search warrant;

Mr. Wright does not challenge the sufficiency of the probable cause for that warrant. Therefore, the

Court will not suppress the physical evidence seized from Mr. Wright's person or from the search of

the two cars.

                                                ***

        For the foregoing reasons, Mr. Wright's Motion to Suppress at ECF No. 193 will be denied.

### B.  Mr. Clark's Motion to Suppress

        Unlike Mr. Wright, Mr. Clark did not challenge Mr. Hicks's detention, nor did he move to

---

[11] The Court also notes that there were four outstanding bench warrants for Mr. Wright. (ECF No. 360, at 103:7–19.) But Officer Maddox did not discover these warrants until after he had arrested and searched Mr. Wright. (*See* ECF No. 217-1, at 4.)

suppress evidence seized from 6216 Auburn. All of the physical evidence that Mr. Clark moved to suppress was seized from his person.[12] Mr. Clark argues that there was no reasonable suspicion or probable cause to detain or arrest him as he was merely a "bystander caught up in a fluid situation." (ECF No. 359, at 2.)

Like with Mr. Wright, the Court concludes that the police had reasonable suspicion to detain Mr. Clark based on the totality of circumstances, including his flight from 6216 Auburn, his presence in a "high-crime" area,[13] his refusal to obey police orders to stop, and his throwing motions over a fence consistent with the police's experience of a suspect's intent to discard evidence.

Mr. Clark claims that the Government's argument that the officers were legally justified to detain him "essentially asserts a 'police state' type martial law justification where as soon as one suspected drug dealer runs into a random residence, anyone nearby becomes subject to search and seizure." (ECF No. 249, at 2.) He says that under the Government's theory, "any man milling around and/or running from the commotion is a 'suspect.'" (ECF No. 359, at 6.) But, as Mr. Clark acknowledges in his briefing, the record shows that there were lots of people outside near 6216 Auburn. (ECF No. 359, at 6, 12; *see also* ECF No. 360, at 46:2–5.) And of this crowd, the only individuals that the officers sought to detain apart from Mr. Hicks were two individuals inside 6216 Auburn who identified themselves as the homeowners (*see* ECF No. 360, at 56:3–57:9, 106:2–4), and Mr. Wright and Mr. Clark, about whom the officers held reasonable suspicion of criminal activity based on

---

[12] The Government concedes that Mr. Clark has standing to challenge his own detention and arrest, and anything seized from his person. (ECF No. 375, at 9.) Counsel for Mr. Clark also confirmed at the evidentiary hearing his belief that there were no standing issues as to Mr. Clark that the Court needs to address. (ECF No. 360, at 33:18–24.)

[13] While it strikes the Court that this concept of a "high-crime area" is something that could easily carry with it a rather indefinite and subjective definition, it nonetheless is a factor that our Court of Appeals has authorized to be considered in the reasonable suspicion calculus. Here, the Court considers it not based on some general or broad-based assessment of the geographic "area," but instead based on the testimony of the involved police officers as to their personal experience in responding to calls in that same area. The police report also reflects the officers' own law enforcement experiences on the 6200 block of Auburn Street.

particularized facts that were unfolding before them.

For support, Mr. Clark primarily relies on *Illinois v. Wardlow*, 528 U.S. 119 (2000), and *United States v. Navedo*, 694 F.3d 463 (3d Cir. 2012). In *Wardlow*, the United States Supreme Court held that under certain circumstances, a person's flight from police may be enough to allow police to detain that person and investigate further. 528 U.S. at 125. In *Navedo*, the Third Circuit explained that a careful reading of *Wardlow* makes clear that the decision does not justify stopping everyone who flees from police. 649 F.3d 463 at 471. The court also emphasized that *Wardlow* dealt with investigatory *Terry* stops, not arrests. *Id.* In *Navedo*, the police arrested the defendant after they observed another man pull a gun out of a bag and show it to the defendant. *Id.* at 465. The police approached both men, and the defendant fled. The Third Circuit reversed the district court's denial of the defendant's suppression motion because it concluded that the officers lacked reasonable suspicion that the defendant was engaged in criminal activity. In particular, the court highlighted that the incident did not occur in a "high-crime" neighborhood and that the police "knew of nothing" that would link the defendant to any criminal activity. *Id.* 465–68. But the circumstances here carry more tangible indicia of suspicion than those present in *Navedo*. As discussed both above and below, there are multiple additional factors that contribute to a finding that reasonable suspicion existed to stop Mr. Clark.

Mr. Clark's argument that the police impermissibly provoked his flight is unavailing. He contends that the officers provoked Mr. Clark to flee because they approached the rear of 6216 Auburn with guns drawn and later arrested him at gunpoint. But the officers identified themselves as police and displayed their badges. Nothing before the Court indicates that Mr. Clark's flight was caused by "fraud." *See United States v. Franklin*, 323 F.3d 1298, 1302 (11th Cir. 2003). And the manner of Mr. Clark's flight shows that he was not merely "mov[ing] away" from the 6216 Auburn residence, but instead was continuing to flee after he had left any perceived "zone of danger." *See id.* at 1303. As

such, his flight is relevant to the Court's evaluation of whether there was reasonable suspicion for a stop.

Mr. Clark further argues that the officers had no basis for their belief that any objects Mr. Clark threw over the fence were contraband or evidence of a crime. (ECF No. 210, at 7.) But in considering whether reasonable suspicion existed, courts must not view facts in isolation and must consider the officer's "knowledge, experience, and common sense judgments about human behavior." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002); *see also United States v. Brown*, 765 F.3d 278, 290 (3d Cir. 2014) (explaining that courts must "give considerable deference to police officers' determinations of reasonable suspicion" (citing *United States v. Mosley,* 454 F.3d 249, 252 (3d Cir. 2006)). Given the circumstances and based on the officers' experiences, Joliet's observation that Mr. Clark made a throwing motion over the fence after running out of 6216 Auburn contributes substantially to a finding that reasonable suspicion existed to stop Mr. Clark when considered in the context of all that was rapidly unfolding before the officers. *See United States v. Graves*, 877 F.3d 494, 499 (3d Cir. 2017) (recognizing that a trained police officer may develop reasonable suspicion "based on acts capable of innocent explanation" (citation omitted)).

And though Mr. Clark argues that "there is not one iota of a fact connecting Mr. Clark to the 6214 or 6216 Auburn residence," the record shows that Officer Joliet, a non-testifying officer, saw Mr. Clark run out of a tent attached to the back of 6216 Auburn. Officer Maddox testified that Joliet told him that he saw Mr. Clark leave from the back of 6216 Auburn, and this observation was also included in the police report. (ECF No. 360, at 95:8-15; ECF No. 217-1, at 4.)

But Mr. Clark does raise an important point worth discussing in more detail. He contends that even if the officers had reasonable suspicion to stop Mr. Clark, they lacked probable cause to arrest him. The record is a bit unclear as to why exactly Mr. Clark was initially arrested. The Court notes that

the officers may have believed they had probable cause to arrest Mr. Clark because he disobeyed lawful

orders to stop (*see, e.g.*, ECF No. 360, at 130:5–11), but the record does not definitively establish that

is what happened. Putting that aside, even if it were unlawful for officers to arrest Mr. Clark precisely

when they did, various exceptions to the exclusionary rule apply that would require the Court to

nonetheless deny Mr. Clark's motion.

Under the attenuation doctrine, "[e]vidence is admissible when the connection between

unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening

circumstance, so that 'the interest protected by the constitutional guarantee that has been violated

would not be served by suppression of the evidence obtained.'" *Utah v. Strieff*, 136 S. Ct. 2056, 2061

(2016) (citation omitted). This case is similar, but not quite the same as *Utah v. Strieff*. In that case, an

officer stopped an individual despite having no reasonable suspicion to do so. The officer learned

during the stop that the individual was subject to a pre-existing valid arrest warrant and arrested the

individual pursuant to that warrant. The officer then conducted a search incident to arrest. *Id.* at 2059.

The Court held that the evidence seized as part of that search was admissible because the discovery of

the arrest warrant attenuated the connection between the unlawful stop and the evidence seized. *Id.* at

2064.

Unlike *Strieff*, there was no unlawful stop here. Rather, as explained above, the officers initially

had reasonable suspicion to stop Mr. Clark. But the stop immediately turned into an arrest. The police

report states that two officers "managed to prone Clark out at gunpoint . . . and take him into custody."

(ECF No. 217-1, at 4.) According to the report, Officer Maddox then ran Mr. Clark's information

through the relevant database, learned that he had multiple pre-existing outstanding warrants, and

conducted a search incident to arrest. (*Id.*) On cross-examination, Officer Maddox provided more

explanation about this part of the police report:

Q:      You stated "Officer Kovach managed to prone Clark." Can you explain what that

        means? What is "prone Clark out at gunpoint"? What does that mean?

A.      That just means make them lay down so they can be handcuffed.

Q.      Does that mean he's pointing the gun at him?

A.      Yes.

Q:      And the rest of that sentence, it says, "Prone Clark out at gunpoint in the yard at 57

        Auburn Street and take him into custody." So at that point he was arrested?

A:      Correct.

Q:      That's what "custody" means; correct?

A:      Correct.

Q:      And then he was checked for warrants; correct?

A:      Correct.

Q:      And then he was searched incident to arrest; correct?

A:      Correct.

(ECF No. 360, at 118:1–16.) This testimony makes clear that: (1) Mr. Clark was arrested before the

officers knew of the outstanding arrest warrants, and (2) the arrest warrants were discovered before

Mr. Clark was searched. So even if the Court assumes that the officers lacked probable cause to arrest

Mr. Clark at the exact point in time that he was arrested, they developed probable cause as soon as they

learned of the outstanding arrest warrants. Notably, like the defendant in *Strieff*, Mr. Clark was not

searched until after the arrest warrants were discovered. The discovery of the arrest warrants thus

attenuated the connection between the potentially unlawful arrest and the evidence seized.

        In addition, the inevitable discovery exception applies here too. The inevitable discovery

doctrine "allows for the admission of evidence that would have been discovered even without the

unconstitutional source." *See Strieff*, 136 S. Ct. at 2061 (citing *Nix v. Williams*, 467 U.S. 431, 443–444 (1984)). Under the inevitable discovery doctrine, "if the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received." *United States v. Stabile*, 633 F.3d 219, 245 (3d Cir. 2011) (citation omitted). The Government can meet its burden by establishing "that the police, following routine procedures, would inevitably have uncovered the evidence." *Id.* (citation omitted).

In this case, the record shows that the standard police procedure is as follows: (1) detain the suspect, (2) check for warrants, (3) do a search incident to arrest, and (4) confirm the warrants. (ECF No.   360, at 117:13–25; *see also id.* at 97:2–7 ("[I]t's standard practice that after detaining these individuals, you would verify if they have an outstanding warrant . . .").) The officers here initially had reasonable suspicion to stop Mr. Clark. Had the police checked for warrants after lawfully stopping Mr. Clark but before arresting him, they would have then discovered the outstanding warrants which would have provided them with probable cause to arrest Mr. Clark at that point. They then could have lawfully searched him incident to that arrest. Thus, the inevitable discovery doctrine would have also come into play in these circumstances.

In sum, the officers had reasonable suspicion to detain Mr. Clark. Even if the initial arrest of Mr. Clark was unlawful because there was no probable cause, the attenuation doctrine and the inevitable discovery doctrine apply. As such, the physical evidence obtained from the search incident to arrest and the electronic cell phone information, which was obtained pursuant to a search warrant, should not be excluded. None of the evidence seized from Mr. Clark will be suppressed.

Finally, Mr. Clark does not contest that he was properly given *Miranda* warnings or that his waiver of his rights was voluntary. According to the police report, Mr. Clark was *Mirandized* and gave

31

statements after the officers checked for outstanding warrants and before he was transported to the Allegheny County Jail pursuant to those warrants. (ECF No. 217-1, at 5.) Because there were valid reasons to arrest Mr. Clark before the statements were given, and there is no record basis to conclude that he had been given the *Miranda* warnings and had voluntary waived the rights explained to him before he gave his statement, the Court will not suppress any post-arrest statements that he made.

## V.   <u>CONCLUSION</u>

The Court concludes that exigent circumstances justified Officer Poling's warrantless entry into 6216 Auburn, and that Officers Joliet and Maddox had reasonable suspicion to stop Mr. Wright and probable cause to arrest him. The Court separately concludes that the officers had reasonable suspicion to stop Mr. Clark. Even if the officers lacked probable cause to arrest him precisely when they did, the attenuation and inevitable discovery exceptions prevent the exclusion of evidence. For these reasons, Mr. Wright's Motion to Suppress (ECF No. 193) and Mr. Clark's Motion to Suppress (ECF No. 210) are denied.

An appropriate Order will follow.

s/ Mark R. Hornak
Mark R. Hornak
Chief United States District Judge

Dated:  June 10, 2021

cc:      All counsel of record